THIS OPINION
IS A PRECEDENT OF THE
TTAB

Mailed: December 5, 2011

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## Trademark Trial and Appeal Board

_____

Rolex Watch U.S.A., Inc.
v.
AFP Imaging Corporation

_____

Opposition No. 91188993
to application Serial No. 77492131
filed on June 5, 2008

_____

Peter Cousins and Beth Frenchman of Gibney, Anthony & Flaherty, LLP and Gary Krugman of Sughrue Mion, PLLC for Rolex Watch U.S.A., Inc.

Norman H. Zivin and Hindy Dym of Cooper & Dunham, LLP for AFP Imaging Corporation.

_____

Before Rogers, Taylor and Lykos, Administrative Trademark Judges.

Opinion by Lykos, Administrative Trademark Judge:[1]

On June 5, 2008, AFP Imaging Corporation ("applicant") filed an application to register the mark ROLL-X, in standard character format, for "x-ray tables for medical and dental use" in International Class 10, pursuant to Section 1(b) of the

_____

[1] Opposer's consented motion (filed December 2, 2011) to designate as confidential portions of its testimony previously submitted on August 25, 2011 is granted. _See_ Trademark Rule 2.127(a). In view thereof, the Board's original opinion in this case issued on December 1, 2011 is set aside.

Trademark Act, 15 U.S.C. § 1051(b), alleging a *bona fide* intent to use in commerce.

Rolex Watch U.S.A., Inc. ("opposer") opposed the registration of applicant's mark on the grounds of (1) priority of use and likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d); (2) likelihood of dilution by tarnishment under Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c); and (3) likelihood of dilution by blurring under Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c). Opposer, in an amended opposition, added a fourth claim that applicant lacked a bona fide intent to use the mark in commerce when the application was filed. Insofar as opposer has not argued the Section 2(d) and dilution by tarnishment claims in its brief, in accordance with the Board's usual practice we would find those claims to have been waived by opposer.[2] *See e.g., Knight Textile Corp. v. Jones Investment Co.,* 75 USPQ2d 1313, 1314 n.4 (TTAB 2005). However, applicant in its brief specifically requested judgment in its favor on these claims, and opposer did not contest the request in its reply brief. Accordingly, we grant applicant's request for judgment on these claims as conceded. *Cf.* Trademark Rule 2.127(a). We therefore

---

[2] Opposer is reminded that under the doctrine of *res judicata*, claims based on the same transactional facts as a prior claim in which a final judgment has been rendered and which should have been litigated in the earlier case are barred from a subsequent suit. *See Sharp Kabushiki Kaisha v. Thinksharp, Inc.,* 448 F.3d 1368, 79 USPQ2d 1376, 1378 (Fed. Cir. 2006).

have only considered the claims of dilution by blurring and applicant's alleged lack of bona fide intent to use its applied-for mark. Applicant, in its answer, denied the salient allegations in the amended notices of opposition.

I. **The Record**

Pursuant to Trademark Rule 2.122(b), the record includes applicant's application file and the pleadings. In addition, the parties introduced the following:

A. **Opposer's Evidence**

1. Opposer's Notice of Reliance comprising the following items:

   a. Opposer's pleaded Registration No. 101819 for the mark ROLEX for "watches, clocks, parts of watches and clocks, and their cases;"

   b. Applicant's responses to opposer's Interrogatory Nos. 2, 3, and 4; and

   c. Excerpts from the discovery deposition of David Vozick, applicant's Chief Executive Officer, with attached exhibits.

2. Declaration of Peter Nicholson, opposer's Vice President and Director of Communications, and Exhibits 1-4 attached thereto;[3] and

3. Declaration of Philip Johnson, offered as an expert witness, Chief Executive Officer of Leo J. Shapiro and Associates, Inc., a market research

---

[3] The parties' stipulation that opposer, in lieu of taking testimony depositions, submit the testimony of its trial witnesses by declaration is hereby approved. Trademark Rule 2.121. The Board commends the parties for agreeing to this alternative method for introducing trial testimony, which presumably saved time and expenses for both parties.

and consulting firm that conducts surveys, and survey attached thereto. [4]

B. **Applicant's Evidence**

1. Applicant's notice of reliance comprised of the following:

a. U.S. Trademark Registration of the mark DENT-X; and

b. Excerpts of the discovery deposition of David Vozick (see discussion below).

## II. **Evidentiary Issues -- Opposer's Objection Pursuant to Trademark Rule 2.120(j)(4)**

To support its claim that applicant lacked a bona fide intent to use the mark ROLL-X when it filed its application, opposer, by notice of reliance, submitted excerpts from the discovery deposition transcript of David Vozick, applicant's Chief Executive Officer ("Vozick Deposition"). In response thereto, applicant submitted via notice of reliance additional excerpted portions of opposer's discovery deposition transcript of Mr. Vozick to explain allegedly incomplete or misleading excerpts submitted by opposer. In its main brief, opposer objected to these submissions, arguing that applicant merely provided a brief statement of relevance and failed to explain

---

[4] Mr. Johnson was properly disclosed as an expert witness on behalf of opposer in expert disclosures served on March 23, 2010. Applicant was given the opportunity to take discovery of Mr. Johnson prior to trial. *See* Board Order dated April 16, 2010. Insofar as applicant has not objected to Mr. Johnson's qualifications as an expert, we have treated him as such.

why opposer's reliance on the excerpts opposer filed are misleading if the additional excerpts are not considered.

Trademark Rule 2.120(j)(4) provides:

> If only part of a discovery deposition is submitted and made part of the record by a party, an adverse party may introduce under a notice of reliance any other part of the deposition which should in fairness be considered so as to make not misleading what was offered by the submitting party. A notice of reliance filed by an adverse party must be supported by a written statement explaining why the adverse party needs to rely upon each additional part listed in the adverse party's notice, failing which the Board, in its discretion, may refuse to consider the additional parts.

Contrary to opposer's assertions, applicant did provide the requisite written statement explaining why it needs to rely upon the additional excerpted portions. Applicant's notice of reliance was accompanied by the statement that the additional excerpts "should in fairness be considered." Applicant then went on to explain the relevance of each additional passage. We find this to be sufficient. Applicant's submissions are necessary to accurately represent the deponent's statement.

In view of the foregoing, opposer's objection is overruled.

## III. **Standing**

Because opposer's registration is of record, opposer has established its standing. *Cunningham v. Laser Golf Corp.,* 222

F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

IV. **Dilution by Blurring**

First, we consider opposer's dilution by blurring claim. The Trademark Act provides a cause of action for the dilution of famous marks. Sections 13 and 43(c) of the Trademark Act, 15 U.S.C. §§ 1063 and 1125(c) provide as follows:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Opposer contends that applicant's ROLL-X mark will "blur" the distinctiveness of opposer's ROLEX mark. The Trademark Act defines dilution by blurring as follows:

> "[D]ilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark.

Section 43(c)(2)(B) of the Trademark Act, 15 U.S.C. § 1125(c)(2)(B).

In deciding opposer's dilution claim, we consider the following factors:

1. Whether opposer's ROLEX mark is famous;

2. Whether opposer's ROLEX mark became famous prior to applicant's date of constructive use; and

3. Whether applicant's ROLL-X mark is likely to cause dilution by blurring the distinctiveness of opposer's ROLEX mark.

See Coach Services Inc. v. Triumph Learning LLC, 96 USPQ2d 1600 (TTAB 2010) ("Coach Services").

A. **Whether opposer's ROLEX mark is famous**

A mark is defined under §1125(c)(2)(A) as "famous" for dilution purposes —

> … if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
>
> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>
> (iii) The extent of actual recognition of the mark.
>
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

We acknowledge the principles that opposer has the burden of establishing that its mark has become famous, and that requirements for proving fame for purposes of dilution are "stringent." Coach Services, supra, 96 USPQ2d at 1610, citing

7

*Toro Co. v. ToroHead Inc.,* 61 USPQ2d 1164, 1170 (TTAB 2001)("*Toro*").

Taking into account the non-exhaustive factors enumerated above as well as other considerations, we find that opposer has established that its trademark ROLEX is famous for dilution purposes. At the outset we note that opposer registered the ROLEX trademark in 1915, almost one hundred years ago.[5] Since that date, the mark has been continuously and exclusively used and registered in the United States.[6] The record is devoid of any third-party usage or registration of similar marks. It is a coined and fanciful term with no other meaning other than its significance as a trademark.

Opposer maintains an extensive sales presence in the United States with approximately 700 official ROLEX jewelers that sell

---

[5] Registration No. 101819, submitted with opposer's notice of reliance; Nicholson Declaration, ¶ 6. Opposer's U.S. registration was issued under the Act of 1905 based on Swiss foreign registration no. 34151, issued October 7, 1913. As such, it is entitled to the benefits of the provisions of the Act of 1946 as though it were registered under the Principal Register except with certain limitations set forth in Section 46(b), 15 U.S.C. Section 1051 note. *See* TMEP § 1601.04.

Prior to November 16, 1989, registrations issued under the 1905 Act were renewable under the 1946 Act for a period of twenty years. Trademark Act § 46(b), 15 U.S.C. § 1051 note; 37 C.F.R. § 2.181(b). Effective November 16, 1989, registrations issued under the 1905 Act are renewable under the 1946 Act for a period of ten years.

In this case, opposer has consistently maintained its U.S. registration, with the most recent fifth renewal for a term of ten years under Section 9 filed on November 16, 2004.

[6] Nicholson Declaration, ¶ 6.

ROLEX timepieces.[7]  For over twenty-five years, opposer's annual U.S. sales of its ROLEX brand timepieces have been in the hundreds of millions of dollars as illustrated by confidential evidence submitted by opposer.  In addition, opposer has extensively advertised and promoted its mark in the United States, spending tens of millions of dollars annually since 1985.[8]

For four decades, opposer has continuously advertised and prominently featured the ROLEX trademark in at least 46 publications circulated nationally and regionally.[9]  As shown by the representative samples of print ads placed in those publications, opposer has advertised its ROLEX timepieces as being synonymous with status, success and high performance under adverse conditions:[10]

> As a race car driver I know that every piece of equipment has been checked because my life, not just a race, depends on it … With over 600 hours of testing behind it, I know my Rolex is as ready as I am.

> His calm, take-charge style prevails, whether as an Air Force general or an airline executive.  His manner is precise, exact. . .like the Rolex he chooses to wear.

> The Inexhaustible Challenge of Everest. …both teams marked the times of their historic Everest ascents with Rolex Chronometers.

---

[7] Nicholson Declaration, Para. ¶ 5.
[8] Nicholson Declaration, ¶ 8.
[9] Nicholson Declaration, ¶ 8, Exh. 2 and 3.
[10] Nicholson Declaration, ¶ 8, Exh. 2 and 3.

>The hands, Virginia Wade.  The watch, Rolex.
>
>In 1947, when Chuck Yeager became the first man to break the sound barrier he had a Rolex chronometer on his wrist.  Fifty years later, still wearing a Rolex, he did it again.

Opposer's advertising campaign is designed to reach the general public.  Opposer's print advertisements appear in publications representing a wide variety of interests such as business (*The Wall Street Journal, Forbes*), adventure (*National Geographic Adventure, Outside*), sports (*Tennis Magazine, Equus, Golf Digest*), and lifestyle (*Elle Décor, Gourmet, Vanity Fair*).[11] They also appear in standard industry publications (*WatchTimes* and *Chronos*).[12] In addition to print, opposer advertises its ROLEX trademark prominently in other media – cable and network television, event promotion, signage, clocks, and co-op advertising.[13]  Opposer annually sponsors and promotes major televised sporting events such as the Wimbledon tennis tournament and U.S. Open golf tournament where the ROLEX trademark is displayed on the score board or clocks visible to attendees and television audiences.[14]  As a result of opposer's advertising efforts, it has garnered unsolicited publicity in

---

[11] Nicholson Declaration, ¶¶ 8 and 9, Exh. 3.

[12] Nicholson Declaration, ¶¶ 8 and 9, Exh. 3.

[13] Nicholson Declaration, ¶ 10.

[14] Nicholas Declaration, ¶ 12.

newspaper and magazine articles equating the ROLEX trademark

with status and reliability:

> From the red carpet to the wrists of rap stars, Rolex is recognized as the ultimate symbol of luxury… The brand dates back to 1905 when Hans Wilsdorf of Kulmbach, Germany, opened Wilsdorf & Davis watchmakers in London.  At the time, men's fashion favored large faced pocket watches, but Wilsdorf became obsessed with creating movements small enough to be worn on the wrist.  So in 1906, inspired by the sound a watch makes when wound, Wilsdorf trademarked the name Rolex, which was both easy to pronounce in many languages and short enough to fit on a watch face… Rolex is still considered the gold standard among watch collectors. After all, nothing says you've made it like a Rolex." *Time*, Spring 2007.

> Rolex's significance to people everywhere is obvious. Nice houses, German sedans and Paris vacations are all well and good, but the Swiss watch remains the premier mainstream symbol of Really Making It in this country. Rappers rap about their diamond-encrusted ones; football players buy one the first day after they're picked high in the draft.  And Wall Street is still loyal to the five-pointed crown.  Rolex is the main noun in the international language of success."  *New York Times,* October 18, 1998.

> Wall Street's women want watches that show just how far they've come…  Some senior women still cling to the Rolex Oyster Perpetual that got them where they are today.  "Timing and reliability are vital in this business, and this watch is indestructible and reliable," says Blythe Masters, head of JPMorgan Chase's global commodities business.  *Forbes,* October 8, 2007.

As evidence that the ROLEX trademark is the subject of

"intense" media attention, since the inception in 2001 of

*Business Week*'s annual article "Best Global Brands" listing the

top 100 brands in the world, Rolex has always appeared on the

list, and in 2009 was ranked the 68th most valuable brand in the world.[15] *See Coach Services, supra,* at 1610, *quoting Toro, supra* at 1180-81 ("examples of evidence to show the transformation of a term into a truly famous mark include… intense media attention…").

Opposer's tremendous and consistent history of U.S. advertising and sales figures, coupled with the additional factors discussed above, supports the finding that ROLEX has become a "household name" and is famous for dilution purposes. *See Thane International, Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 64 USPQ2d 1564, 1575 (9th Cir. 2002) ("the transformation of a term into a truly famous mark" means that "the mark must be a household name.").

In its brief, applicant cites to *Coach Services, supra,* in which the Board found that plaintiff failed to prove fame for dilution purposes to support the proposition that opposer has failed to prove such fame in this case. Applicant's attempt to draw an analogy to the quantity and quality of evidence presented here with *Coach Services* is unconvincing. The plaintiff in *Coach Services* submitted worldwide evidence of sales and advertising expenditures for only one year, 2008, without breaking down the sales and advertising figures for the United States. By contrast, opposer has submitted

---

[15] Nicholson Declaration, ¶ 13.

representative figures of annual sales and advertising expenditures for the United States over a substantial period of time spanning 25 years. Another key distinction is that the plaintiff in *Coach Services* advertised almost exclusively in print fashion media targeted to young women. Opposer, however, advertises in a variety of media, including national television, targeted to the general public. Lastly, we note key differences in the nature of the marks. ROLEX is a coined, arbitrary term with no meaning in the English language or any other foreign language. By comparison, the mark at issue in *Coach Services*, COACH is an ordinary word with multiple meanings. Thus, we find applicant's arguments based on the *Coach* case to be unavailing.

Based on the evidence of record, we find that opposer's mark ROLEX is famous.

B. **Whether opposer's ROLEX mark became famous prior to applicant's date of constructive use**

The majority of the evidence in the record about the fame of opposers' ROLEX trademark predates the June 5, 2008 filing date of applicant's intent-to-use application. Therefore, we find that the fame of the trademark ROLEX was well-established prior to applicant's constructive use date for ROLL-X.

13

C.    **Whether applicant's ROLL-X mark is likely to cause dilution by blurring the distinctiveness of opposer's ROLEX mark.**

Dilution by blurring is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark," 15 U.S.C. § 1125(c)(2)(B), and may be found "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury," 15 U.S.C. § 1125(c)(1).  Dilution by blurring occurs when a substantial percentage of consumers, upon seeing the junior party's use of a mark on its goods, are immediately reminded of the famous mark and associate the junior party's use with the owner of the famous mark, even if they do not believe that the goods come from the famous mark's owner. *See e.g.*, *National Pork Board v. Supreme Lobster and Seafood Co.,* 96 USPQ2d 1479 (TTAB 2010).  In addition, we must determine not only whether there is an 'association' arising from the similarity of the marks, but whether such association is likely to 'impair' the distinctiveness of the famous mark."  *Nike Inc. v. Maher*, 100 USPQ2d 1018, 1023 (TTAB 2011)("*Nike v. Maher*"). In determining whether a mark or trade name is likely to cause dilution by blurring, the Board may consider the following six non-exhaustive factors:

(i) The degree of similarity between the mark or trade name and the famous mark.

(ii) The degree of inherent or acquired distinctiveness of the famous mark.

(iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

(iv) The degree of recognition of the famous mark.

(v) Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi) Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B)(i)-(vi).

1. **The degree of similarity between the mark or trade name and the famous mark**

Recently, in *Nike Inc. v. Maher, supra*, the Board, following the lead of the Court of Appeals for the Second and Ninth Circuits, clarified that, under the Trademark Dilution Revision Act of 2006 (TDRA), Congress took a different approach to this factor of similarity of marks from the predecessor anti-dilution law, the Federal Trademark Dilution Act of 1996, which was generally found to require "substantial similarity" between the famous mark and the mark at issue for dilution by blurring to occur. Based on the statutory language in the TDRA requiring analysis of the "degree of similarity" between the famous mark and the mark at issue, the 9th Circuit, in *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,* 633 F.3d 1158, 1171, 97 USPQ2d 1947, 1958 (9th Cir. 2011), stated the following:

15

Congress did not require an association arising from the "substantial" similarity, "identity" or "near identity" of the two marks.  The word chosen by Congress, "similarity," sets forth a less demanding standard than that employed by many courts under the FTDA.

…

This analysis of the language of the statute, and our comparison of this language with the now-repealed statute, are further supported by Congress's decision to employ, in subsection (c)(2)(B), a non-exhaustive list of relevant factors to determine when dilution has occurred. Congress's implementation of such a methodology is simply not compatible with a determination that identity, near identity or substantial similarity are necessary to constitute a threshold showing for relief under § 1125(c). Indeed, Congress chose instead to make the "degree of *similarity* between the mark or trade name and the famous mark," *id.* § 1125(c)(2)(B)(i) (emphasis added), to be the first of the six (or more) relevant factors to be considered.

*See also, Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 588 F.3d 97, 92 USPQ2d 1769 (2d Cir. 2009) ("Although 'similarity' is an integral element in the definition of 'blurring,' we find it significant that the federal dilution statute does not use the words 'very' or 'substantial' in connection with the similarity factor to be considered in examining a federal dilution claim.") and *Tiffany (NJ) Inc. v. eBay, Inc.,* 600 F.3d 93, 111 n.18, 94 USPQ2d 1188, 1201 n.18 (2d Cir. 2010) ("We have recently explained that under the [TDRA] the similarity between the famous mark and the allegedly blurring mark need not be 'substantial' in order for the dilution by blurring claim to succeed.").

With this guidance in mind, the test we employ is the degree of similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. See *Nike Inc. v. Maher, supra*, and *Coach*, *supra.* In other words, are applicant's and opposer's marks "sufficiently similar to trigger consumers to conjure up a famous mark when confronted with the second mark." *National Pork Board*, 96 USPQ2d at 1497.[16]

Acknowledging that there is no correct pronunciation of trademarks, we nonetheless note that Opposer's mark ROLEX and applicant's ROLL-X are likely to be pronounced in an identical manner. However, the marks are spelled differently and, because of the spelling of applicant's mark, it engenders a different appearance, meaning and commercial impression from opposer's mark. Because of the hyphen between ROLL and X, consumers are likely to view the mark as consisting of the English word ROLL, which has various meanings including "to move on rollers or wheels (rolled the patient into the operating room)"[17] and the

---

[16] To be clear, we are not conducting a likelihood of confusion analysis under Section 2(d) although we are considering many of the same factors.

[17] www.merriam-webster.com. The Board may take judicial notice of dictionary definitions, including online dictionaries which exist in printed format. *See In re CyberFinancial.Net Inc.,* 65 USPQ2d 1789 (TTAB 2002). *See also University of Notre Dame du Lac v. J. C. Gourmet Foot Imports Co., Inc.,* 213 USPQ 594 (TTAB 1982), *aff'd,* 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

letter "X," which, when the mark is used in connection with applicant's goods, is likely to be perceived as suggesting the term "x-ray," when the mark is used in connection with applicant's goods. Indeed, Mr. Vozick, applicant's Chief Executive Officer, stated that he created the name based on the product's attributes:

> Q. How did you come to pick that mark?
>
> A. The product that it is being applied to is a movable stretcher, radiolucent, so it's good for the x-ray application. It can roll on four castors, and therefore there's commonality of name and intention between the rolling stretcher, x for x-ray…[18]

Thus, we find the differences between the marks in terms of appearance, meaning, and commercial impression greatly outweigh any similarity in pronunciation. The similarities/dissimilarities of the marks factor favors applicant.

2. **The degree of inherent or acquired distinctiveness of the famous mark**

As noted previously, ROLEX is a coined, arbitrary term with no meaning other than as a trademark. Since opposer's mark is inherently distinctive, this factor favors a finding of likelihood of dilution.

3. **The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark**

---

[18] Vozick Deposition, p. 26, lines 11-18.

Applicant has not introduced any evidence of third-party usage of the mark ROLEX. The record is also devoid of evidence of use of phonetic equivalents, such as ROLL-X. Accordingly, on this record, we conclude that opposer has made substantially exclusive use of the ROLEX trademark, and therefore, this dilution factor favors opposer.

4. **The degree of recognition of the famous mark**

As discussed above, ROLEX is widely recognized by the general public as a trademark identifying opposer's timepieces. The mark has been in continuous use and consistently maintained and registered in the United States for over 100 years. As noted earlier, for over twenty-five years, opposer's annual U.S. sales of its ROLEX brand timepieces have been in the hundreds of millions of dollars and annual U.S. advertising expenditures have been in the tens of millions of dollars. In addition, as discussed earlier, ROLEX has been consistently named as one of the top 100 brands in the world since 2001 by *Business Week*. The degree of recognition is high and therefore favors opposer.

5. **Whether the user of the mark or trade name intended to create an association with the famous mark.**

Opposer has not presented any evidence demonstrating that applicant intended to create an association with opposer's ROLEX trademark. Indeed, to the contrary, as noted above, Mr. Vozick, the person who created applicant's applied-for mark ROLL-X

19

testified he came up with the name based on the product's attributes, and as an extension of its current product line marketed under the DENT-X trademark.[19]  In view thereof, this dilution factor favors applicant.

6. **Any actual association between the mark or trade name and the famous mark**

To support its claim that applicant's use of the mark ROLL-X is likely to cause dilution of opposer's ROLEX trademark, opposer submitted a survey conducted by Philip Johnson, Chief Executive Officer of Leo J. Shapiro and Associates, Inc., targeted to "animal professionals (e.g., veterinarians, veterinary technicians, office managers etc.) who are responsible for making the decision about purchasing x-ray tables."[20]  Mr. Johnson designs surveys that measure consumer behavior and opinions.[21]  The stated objective was to determine the extent, if any, to which healthcare professionals who purchase x-ray tables would think of the ROLEX trademark or

---

[19] Vozick Deposition, p. 15, line 23; p. 17, line 3; applicant's Notice of Reliance, Exhibit 1.  Registration No. 2000578, registered September 17, 1996, alleging June 24, 1993 as the date of first use anywhere and in commerce, Sections 8 and 9 affidavits accepted and granted.

[20] Johnson Survey, ¶ 5.  Applicant has filed an intent-to-use application and has not engaged in any actual use of the mark ROLL-X. In view of this circumstance, opposer's submission of an expert designed survey is entirely appropriate.  *See National Pork Board v. Supreme Lobster and Seafood Co.,* 96 USPQ2d 1479, 1492 (TTAB 2010).

[21] As noted earlier, opposer disclosed Mr. Johnson as an expert witness in its disclosures filed March 23, 2010, and applicant did not object to his qualifications as an expert.

products when encountering an x-ray table named ROLL-X.[22]   The survey involved 301 telephone interviews based on a random sample of veterinary clinics located in the United States.[23] Following the methodology used in *Nike, Inc. v. Nikepal International, Inc.,* 84 USPQ2d 1820 (E.D. Cal. 2007) and using a double-blind protocol, the interviewers screened for qualified survey respondents who were not confused as to source.  The survey used both a test cell bearing applicant's mark ROLL-X (200 interviews) and a control cell bearing the name DIGI-X (101 interviews).  Following a series of screening questions, the respondents shown the test cell ROLL-X were then asked the following questions:  "Assume for a moment that you were looking for a new x-ray table and you encountered one that uses this name….  What, if anything, came to your mind when I first showed you the name of this x-ray table?"  Of the test cell respondents, 82% replied that something came to mind.  Of that 82%, 42% replied "Rolex/Watch," 32% replied "Portable/ Movable/ Rolling," 18% replied "X-Ray Tables/Equipment" and 7% replied

---

[22] Johnson Survey, ¶ 4.

[23] Johnson Survey, ¶ 3.

"X-Rays."[24]

Although 42% of the respondents who stated that when something came to mind, it was "Rolex/Watch," we find this level of "actual association" insufficient to prove a likelihood of dilution between opposer's ROLEX mark and applicant's ROLL-X mark. This figure is not persuasive given that a higher percentage, 50% of respondents who replied that something came to mind, thought of a feature of the goods (portable, rolling) or the actual goods themselves (x-ray tables/equipment). Moreover, the survey results, while showing an "actual association" between opposer's and applicant's marks, do not establish that such an association would impair the distinctiveness of opposer's famous mark. *See Gap Inc. v. G.A.P. Adventures Inc.,* 100 USPQ2d 1417, 1431 (S.D.N.Y. 2011) (despite consumer survey results showing a likelihood of association between plaintiff's and defendant's marks, court

---

[24] The results included other mentions such as "Rolodex/Filing System," "Rolo/Candy."

Applicant has objected to the survey as flawed because it does not replicate the market conditions in which individuals would encounter applicant's ROLL-X mark, namely on rolling x-ray tables. We disagree. We acknowledge that as a practical matter, because applicant has not yet made use of its mark, no current market/purchase conditions exist. That being said, as noted above, the questions above clearly communicated to respondents the nature the goods. In addition, we find that the methodology comports with the protocol set forth in *Nike, Inc. v. Nikepal International, Inc.,* 84 USPQ2d 1820 (E.D. Cal. 2007). As such, we have given the survey full consideration.

found no likelihood of impairment; federal dilution claim therefore dismissed). *See also* 4 J. Thomas McCarthy, McCarthy On Trademarks And Unfair Competition § 24:120 (4th ed, 2011) ("[t]he fact that people 'associate' the accused mark with the famous mark does not in itself prove the likelihood of dilution by blurring"). As such, this factor favors applicant.

7. **Balancing the factors**

In balancing the factors, we find that the degree of dissimilarity between the marks, the conflicting results obtained from the Johnson survey, and lack of evidence that applicant intended to create an association with opposer's mark outweigh the recognition, distinctiveness and substantially exclusive use of opposer's ROLEX trademark. In addition, as noted earlier, the statute requires opposer to not only prove an association between its own and applicant's mark, but that such an association will impair the distinctiveness of opposer's famous mark. While acknowledging that this burden of proof is more difficult for an application based on Section 1(b), opposer did not introduce any evidence, either through its consumer survey or expert testimony, of the degree to which opposer's marketing power would potentially be diminished by applicant's intended use of its mark. *See Gap Inc., supra.,* (although court found that plaintiff's GAP mark was famous for dilution purposes and similar to defendant's G.A.P. Adventures marks, that

23

defendant intended to create an association with plaintiff's mark, and that a consumer survey showed a likelihood of association between plaintiff's and defendant's marks, court found that plaintiff "has not proved that, as a result of the likelihood that consumers will associate the marks, Gap is likely to suffer an impairment of the distinctiveness of its marks…"; federal dilution claim therefore dismissed).  Thus, we find that based on the record before us, opposer has not demonstrated that the registration of applicant's ROLL-X mark is likely to cause dilution by blurring of its ROLEX trademark.

V.    **Lack of Bona Fide Intent**

We now consider opposer's claim that applicant lacked a bona fide intent to use the mark ROLL-X for the applied-for goods in commerce at the time it filed its application. "A determination of whether an applicant has a bona fide intention to use the mark in commerce is an objective determination based on all the circumstances." *Boston Red Sox v. Sherman,* 88 USPQ2d 1581, 1586 (TTAB 2008), *citing Lane Ltd. v. Jackson Intl. Trading Co.,* 33 USPQ2d 1351, 1355 (TTAB 1994). "Opposer has the initial burden of demonstrating by a preponderance of the evidence that applicant lacked a bona fide intent to use the mark on the identified goods.  The absence of any documentary evidence on the part of an applicant regarding such intent constitutes objective proof sufficient to prove that the

applicant lacks a bona fide intention to its use its mark in commerce." *Id.* at 1587, *citing to Commodore Electronics Ltd. v. CBM Kabushiki Kaisha Opp.,* 26 USPQ2d 1503, 1507 (TTAB 1993) ("*Commodore Electronics*"). If an opposer establishes a prima facie case, the burden shifts to applicant to rebut that prima facie case by producing evidence which would establish that it had the requisite bona fide intent to use the mark when it filed its application. *See Commodore Electronics, supra,* 26 USPQ2d at 1507.

Opposer has demonstrated through applicant's responses to discovery, that applicant does not possess any documentary evidence (e.g., advertising materials, labels) to support a bona fide intent to use the ROLL-X mark in commerce when it filed its application. Insofar as opposer has satisfied its initial burden of showing the absence of any documentary evidence regarding applicant's bona fide intention to use the mark, the burden now shifts to applicant to come forward with evidence which would adequately explain or outweigh its failure to provide such documentary evidence in response to opposer's discovery requests. *See, e.g., Commodore Electronics, supra.*

In this case, we find that applicant has submitted sufficient evidence to rebut the lack of documentary evidence. Consistent with its overall business model, applicant promotes,

25

advertises, and uses other imaging products.[25]  Applicant owns and uses the registered mark DENT-X for "film processors for developing X-ray and photographic films and parts therefor; and X-ray machines, namely X-ray sources and controls."[26]  It advertises its mark DENT-X for its human dental x-ray business.[27]  Thus, the filing of the application for the ROLL-X mark is consistent with an extension of its current product line.  *Cf. Commodore Electronics, supra,* 26 USPQ2d at 1507.  In addition, this evidence demonstrates that applicant has the capacity to market and manufacture the goods identified in its application, further suggesting that applicant has been acting in good faith and not merely trying to reserve a right in the ROLL-X mark.[28]  *See id.*

Lastly, applicant explained that it suspended its promotional activities in connection with the ROLL-X mark only because the instant opposition was filed.[29]  While obviously this occurred after the filing of applicant's application, it corroborates the other evidence discussed above showing that

---

[25] Vozick Deposition, p. 15, line 23; p. 17, line 3.

[26] Applicant's Notice of Reliance, Exhibit 1.  Registration No. 2000578, registered September 17, 1996, alleging June 24, 1993 as the date of first use anywhere and in commerce, Sections 8 and 9 affidavits accepted and granted.

[27] Vozick Deposition, p. 15, line 23; p. 17, line 3.

[28] Vozick Deposition, p. 26, line 5; p. 27, line 5.

[29] Vozick Deposition 32, lines 7-15.

applicant otherwise had the capacity and intent to use the ROLL-X mark in connection with the identified goods. Consideration of this evidence as a whole supports a finding that applicant had a bona fide intent to use the ROLL-X mark at the time it filed its application.

**DECISION:** The opposition is dismissed on the grounds of likelihood of dilution by blurring and applicant's alleged lack of bona fide intent to use its applied-for mark. The application will now proceed to the Intent-to-Use Division for issuance of a notice of allowance.