**DISC GOLF ASSOCIATION, INC.,**
**Plaintiff–Appellant,**

v.

**CHAMPION DISCS, INC., a California**
**Corporation, Defendant–Appellee.**

**No. 97–16430.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 11, 1998.

Decided Sept. 15, 1998.

---

Daniel V. Thompson, Thompson & Howison, Dallas, Texas, for plaintiff–appellant.

John A. Rafter, Jr. (argued), Edward M. Jordan (on the brief), Lyon & Lyon, Los Angeles, California, for defendant–appellee.

Before: BRUNETTI, TASHIMA, and GRABER, Circuit Judges.

GRABER, Circuit Judge:

Disc Golf Association, Inc. (DGA), brought this action against Champion Discs, Inc.

(Champion), alleging trademark and trade dress infringement under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The district court granted summary judgment in favor of Champion on the ground that DGA's claimed trademark or trade dress, a parabolic chain design, is functional as a matter of law and, therefore, is not entitled to Lanham Act protection.[1]

DGA appeals, claiming two errors: (1) that the district court erred when it granted summary judgment in Champion's favor, and (2) that the district court abused its discretion when it awarded copying costs to Champion for 14,000 discovery documents. We hold that (1) the district court did not err when it granted summary judgment in Champion's favor because, on this record, the parabolic chain design as to which DGA claims trademark or trade dress protection is functional and, therefore, is not entitled to protection under section 43(a) of the Lanham Act; and (2) the district court abused its discretion when it awarded the copying costs to Champion, because Champion copied the documents after the district court already had granted summary judgment in its favor.

## FACTS AND PRIOR PROCEEDINGS

DGA and Champion manufacture disc entrapment devices that are used in the game of disc golf. Disc golf is played like conventional "ball golf," but with flying discs, such as Frisbees, instead of clubs and golf balls. The devices manufactured by DGA and Champion serve as targets for the flying discs and constitute the "holes" on a disc golf course. A "hole" is completed when the target "catches" the disc, that is, when the disc hits the parabolic chain configuration and falls into a basket below.

Disc golf is played throughout the United States and abroad, both competitively and recreationally. Tournaments are commonplace. The Professional Disc Golf Association, founded in 1976, writes the rules governing how to play the game and establishes technical specifications for disc golf equipment, including targets.

---

1. DGA's complaint also alleged trademark dilution under the Trademark Dilution Act of 1996, 15 U.S.C. § 1125(c). The district court granted summary judgment to Champion on that claim. DGA does not challenge that ruling on appeal, and we do not consider it.

In the mid–1970s, DGA's president, Edward Headrick, invented the DISC POLE HOLE(R), a disc golf target consisting of a central pole, a basket that surrounds the pole, and a set of chains that hangs above the basket.[2] The upper ends of the chains are attached to a circular bracket that is affixed to the top of the pole; the chains' lower ends are attached to a collar that is mounted on the pole within the confines of the basket. Because the diameter of the circular bracket significantly exceeds the diameter of the collar below, the chains naturally hang in a parabolic shape. DGA obtained U.S. Patent No. 4,039,189 for the DISC POLE HOLE(R) in 1977 (Patent '189) and, as a result, became the dominant manufacturer of disc golf targets. In fact, DGA has supplied equipment to 395 of the 514 disc golf courses operating in the United States.

Patent '189 expired in 1994. A year later, in 1995, Champion began marketing the DISCATCHER PRO, a disc golf target that also uses a parabolic chain design. DGA filed this action to assert trademark or trade dress rights only in the parabolic chain design. As noted, the district court entered summary judgment in favor of Champion.

Thereafter, Champion submitted its Bill of Taxable Costs under N.D. Cal. Civ. Loc. R. 54–1. The cost bill included a charge of $5,161.88 for copying about 14,000 documents. The court clerk initially struck that charge from the cost bill, but the district court reinstated it and taxed DGA the full amount.

## FUNCTIONALITY OF THE PARABOLIC CHAIN DESIGN

### A. *Standard of Review*

We review *de novo* a grant of summary judgment. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. *Id.*

### B. *Lanham Act Analysis*

To recover for the infringement of a trademark or trade dress[3] under section 43(a) of the Lanham Act,[4] DGA had to prove that (1) the parabolic chain design is non-functional, (2) the design is inherently distinctive or acquired distinctiveness through a secondary meaning, and (3) there is a likelihood that the consuming public will confuse Champion's DISCATCHER PRO with DGA's product. *See International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 823 (9th Cir.1993) (stating the elements of a trademark claim). The district court held that DGA had failed to present a triable

---

2. The attached Appendix is a drawing of this target.

3. "[T]rade dress refers to the total image of a product and may include features such as size, shape, color, color combinations, texture or graphics." *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir.1993) (internal quotation marks and citation omitted). If a seller uses a trade dress that is confusingly similar to a competitor's, that conduct is actionable as unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir.1989).

The analysis for determining whether a trade dress or an *unregistered* trademark is protected under section 43(a) of the Lanham Act is essentially the same. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (stating that section 43(a) "provides no basis for distinguishing between trademark and trade dress"); *International Jensen*, 4 F.3d at 823 (so noting).

4. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

issue of fact as to the first element. DGA argues that the trial court erred, because DGA presented sufficient evidence to create a question of fact on the issue of functionality. *See Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir.1987) (holding that functionality is a question of fact, which the plaintiff bears the burden of proving).

 Trademark or trade dress protection extends only to product features that are nonfunctional. A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (internal quotation marks and citation omitted). This court has observed that "[f]unctional features of a product are features which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product." *Rachel*, 831 F.2d at 1506 (internal quotation marks and citation omitted).

The Supreme Court in *Qualitex* articulated the rationale underlying the requirement of nonfunctionality, which bears particular relevance to this case:

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, 35 U.S.C. §§ 154, 173, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

514 U.S. at 164–65, 115 S.Ct. 1300. That is the basic rationale that Champion advances to support its argument for affirmance. It

contends that, by claiming trademark or trade dress rights in the parabolic chain design, DGA is impermissibly attempting to extend its expired patent and to maintain monopoly control in perpetuity over the market for disc golf targets.

 To determine whether a product feature is functional, we consider several factors: (1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. *International Jensen*, 4 F.3d at 823; *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 516 (9th Cir.1989). No one factor is dispositive; all should be weighed collectively. *International Jensen*, 4 F.3d at 823.

Each of those factors considered separately and all of them considered together demonstrate that the parabolic chain configuration is functional. The record contains no material issue of fact that would permit a contrary conclusion.

### (1) *Utilitarian advantage*

 With respect to the factor of utilitarian advantage, the existence of an expired utility patent is weighty evidence of functionality, although that fact alone is not dispositive. *See Clamp Mfg.*, 870 F.2d at 516–17 (holding that an expired utility patent provided strong evidence of functionality, but that the plaintiff had presented sufficient evidence to overcome it). A utility patent must be examined closely to ensure that the disclosure of the configuration is primarily functional and not merely incidental. J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:89, at 7–207 (4th ed.1998).

Notwithstanding Patent '189, DGA argues that issues of fact remain with respect to functionality, for four reasons. First, DGA asserts that Patent '189 does not *expressly* disclose the functional advantage of the parabolic chain design. DGA contends that the "gist of the invention was the provision of any energy absorbing structure over a bas-

ket" and that the use of the parabolic design to illustrate the energy-absorbing function was merely incidental. DGA also notes that Patent '189 never mentions the term "parabolic."

Second, DGA argues that there is no utilitarian advantage to its design, because a parabolic chain makes a "hole" harder to complete than does (for example) a straight chain configuration. Thus, DGA contends that the parabolic design actually provides a utilitarian *dis*advantage. In connection with this argument, DGA asserts that a product feature must provide a *superior* utilitarian advantage in order to be functional.

Third, DGA argues that the concept of functionality has no place at all in evaluating devices for playing a game. It contends that " 'utilitarian advantage' is not a valid basis for comparing disc golf targets, since the devices are not intended to have a useful function in the first place. It makes sense to compare hand tools, for example, by utilitarian merit, but not game facility equipment like disc golf targets."

Finally, DGA argues that the declaration of its president, Edward Headrick, the inventor who obtained Patent '189, creates an issue of fact. Whereas the patent described more than one function performed by the disc golf "hole" device, the declaration asserts, in essence, that "the function of a disc golf 'hole' device is merely to objectively indicate in some fashion that a 'hole' has been completed."

We consider each of DGA's arguments in turn. None persuades us.

First, a close review of Patent '189 does disclose utilitarian advantages of the parabolic chain design. Claim 1 of the patent describes the purpose of the chain configuration as *"absorbing the kinetic energy of the disc* and causing the disc to be deposited in the basket." (Emphasis added.) Figures. 1, 2, and 4 illustrate that function using the parabolic design. Additionally, when read together, Claims 2 and 3 implicitly describe a parabolic configuration. They claim a design in which the "upper ends of said chains [are] attached to said support bracket at spaced annular positions around the periphery

thereof" and "a collar mounted on said post within said basket [serves] as a mount for the lower ends of the chains." DGA's president admitted in his deposition that such a design necessarily yields a parabolic configuration. Finally, Patent '189 touts the benefits of DGA's target over other disc golf targets:

> A problem has arisen in the prior art flying disc golf courses in detecting as a certainty whether or not a disc has actually struck the post [target] for any particular throw, especially when the disc has been thrown in the direction of the post from a considerabl[e] distance.

> The aforesaid problem is solved by the device of the present invention, which *provides an energy absorbing means on the post* which serves to arrest the forward motion of the disc, and which also provides an entrapment means in which the disc is deposited. By use of the device of the present invention, any disc properly thrown against the post is caught, and *all prior ambiguities are obviated.*

(Emphasis added.) When read in conjunction with the patent claims and illustrations, the foregoing description clearly discloses two utilitarian advantages of the parabolic chain design over other disc golf targets: greater energy absorption and clearer identification of a completed "hole."

■ DGA's second argument, that the parabolic design provides a utilitarian *dis* advantage for disc golf players, is equally unconvincing. A product feature need only have *some* utilitarian advantage to be considered functional. *See International Jensen,* 4 F.3d at 823 (stating that the court should consider whether the design "yields *a* utilitarian advantage" (emphasis added)). This court has never held, as DGA suggests, that the product feature must provide *superior* utilitarian advantages. To the contrary, this court has suggested that "in order to establish nonfunctionality the party with the burden must demonstrate that the product feature serves *no purpose* other than identification." *Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1531 (9th Cir.1992) (internal quotation marks and citation omitted (emphasis added)). It is clear from Patent '189 that the parabolic design improves "catchability" and the identi-

fication of caught discs. Those are utilitarian purposes.

■ DGA's third argument is that a product feature that improves a mere game is not utilitarian at all, because game devices are not intended to have a useful function in the first place. That argument confuses the focus of the functionality inquiry.

> It is crucial that the enquiry not focus on the usefulness of the article overall, but rather must focus on the utility of that exact feature or combination of features that is claimed as a protectable trade dress or mark. The issue is not whether a product is functional, but whether *this particular* shape and form of product which is claimed as trade dress is functional.

McCarthy, § 7:70 at 7–146 (emphasis in original). Thus, contrary to what DGA suggests, the fact that the ultimate product, the disc golf target, has limited practical utility is irrelevant. The crucial question is whether the parabolic chain design itself, as the claimed protectable trade dress or mark, plays a functional role in the overall product. As discussed above, it does.

■ DGA's final argument is that its president's declaration creates an issue of fact respecting the purported utilitarian advantages disclosed in Patent '189. That argument is not available to DGA. A trademark proponent cannot create an issue of material fact regarding a shape's functionality, and thus survive summary judgment, by contradicting an earlier assertion contained in an expired utility patent that the same shape is functional.

> A kind of estoppel arises. That is, one cannot argue that a shape is functionally advantageous in order to obtain a utility patent and later assert that the same shape is non-functional in order to obtain trademark protection.

McCarthy, § 7:89 at 7–208.

■ A similar principle applies on a motion for summary judgment. A party cannot create a triable issue of fact, and thus survive summary judgment, merely by contradicting his or her own sworn deposition testimony with a later declaration. *See Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 306 (9th Cir. 1992) (stating that general principle). That is, in effect, what DGA is trying to do. Its president made, under oath,[5] certain claims with respect to the utilitarian advantages of the parabolic chain design when he applied for patent protection. DGA cannot create a triable issue of fact so as to survive summary judgment by contradicting those sworn claims after the patent has expired.

In summary, we conclude that there are no material issues of fact concerning utilitarian advantage and that this factor weighs in favor of the functionality of the parabolic chain design.

### (2) *Availability of alternative designs*

This court has stated that "the availability of alternative methods of manufacture must be more than merely theoretical or speculative. . . . The court must find 'that commercially feasible alternative configurations exist.'" *Sega Enters.*, 977 F.2d at 1531 (*quoting Clamp Mfg.*, 870 F.2d at 516) (emphasis in *Sega Enters.*). *See also* McCarthy, § 7:75 at 7–156 (the availability of alternative designs by itself is insufficient to prove nonfunctionality; there must be a sufficient number of alternative designs such that providing trademark protection to one design would not hinder competition).

DGA claims that there are at least 15 alternative, commercially feasible designs of disc golf targets currently available and that, because parabolic chains are not required to play disc golf, the potential number of designs is without limit. As support, DGA points out that 66 of the nation's 514 disc golf courses use targets lacking a parabolic chain design.[6] At the very least, DGA argues, a

---

**5.** Title 35 U.S.C. § 115 provides that a patent application is to be submitted under oath.

**6.** As noted, 395 of the nation's 514 disc golf courses use DGA's parabolic chain targets. Of the remaining courses, 16 use Champion's DIS-CATCHER PRO targets, 66 use non-parabolic chain targets, and on 52 courses the type of target could not be identified. The total number of courses identified in the record as having targets (529) exceeds the actual number of courses (514), because some courses use more than one type of target.

question of material fact exists, which a jury should decide.

Champion responds that, even though DGA identifies 15 alternative designs, only those with chains can compete effectively. Champion further contends that chain designs fall into three general categories—parabolic, conical, and straight-hanging—and that the non-parabolic designs are inferior, because they do not catch discs as well and cost more to manufacture. Champion also points out that none of the alternative designs offered by DGA has been approved by the Professional Disc Golf Association, which is responsible for establishing and maintaining technical standards for disc golf targets.

Even when we view the record in the light most favorable to DGA, there is insufficient evidence to support an inference of commercial viability of alternative designs. DGA has provided no sales data for alternative designs and no information pertaining to the market share of any particular alternative design. DGA's only evidence of the use of alternative designs suggests that disc golf courses use—other than DGA's products—a motley assortment of non-commercial targets, including posts, birdcages, lamp poles, barrels, and even trees. That same evidence shows that about 77 percent of disc golf courses currently use DGA's parabolic-design targets and that fewer than 4 percent of disc golf courses use commercially available targets with a non-parabolic chain design. The total percentage of commercially available, non-DGA targets in current use, including the DISCATCHER PRO, is only slightly higher, at less than 7 percent. On this record, if DGA were allowed to trademark the parabolic design, its market dominance undoubtedly would continue and would have the effect of resurrecting its expired utility patent.

### (3) *Advertising*

"If a seller advertises the utilitarian advantages of a particular feature, this constitutes strong evidence of functionality." McCarthy, § 7:74 at 7–152. DGA contends that its advertising does not specifically tout the functionality of the parabolic design, but instead promotes the quality of the product in general. *See Clamp,* 870 F.2d at 516 (stating that the court should consider "the extent of advertising touting the utilitarian advantages *of the design*" (emphasis added)).

Like Patent '189, DGA's advertising never mentions the term "parabolic." However, the functional value of the parabolic design is implicit in the advertising. *See In re Witco Corp.,* 14 U.S.P.Q.2d 1557, 1560, 1989 WL 274427 (TTAB 1990) (holding that the advantages of a specific design feature need not be touted explicitly, but may be implied from the advertisement as a whole). For example, in one of its advertisements DGA asserts:

> The challenge was to design a device as reliable as the "cup" in "ball golf" that could catch a disc in its natural flight path and still be vandal resistant. After 56 models and numerous meetings with L.A. County, it was decided that the present design met all criteria.... The question, "DID YOU SEE THAT SHOT?" is no longer asked, the disc in the basket is irrefutable evidence of the completion of each hole. The Disc Pole Hole® is now the standard of Disc Golf™ Courses all over the country and is protected by U.S. Patent No. 4039189.

Accompanying that statement is a picture of a flying disc hitting the parabolic chain and falling into the basket. The inference of functionality is inescapable: The parabolic chain configuration is designed to "catch" the flying disc and to identify affirmatively whether a "hole" is completed.

### (4) *Cost of manufacture*

A functional benefit may arise if "the design achieves economies in manufacture or use." *International Jensen,* 4 F.3d at 823. DGA, which has the burden of proof, offered no evidence that the parabolic chain design was not relatively simple or inexpensive to manufacture.

### (5) *Conclusion*

The evidence in the record permits but one legal conclusion: DGA has failed to demonstrate that, or even to create a material issue of fact whether, the parabolic chain design is nonfunctional. Accordingly, the district

court did not err when it granted summary judgment in favor of Champion.

## TAXATION OF COPYING COSTS

### A. *Standard of Review*

 We review a district court's award of costs for abuse of discretion. *Haagen–Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 920 F.2d 587, 588 (9th Cir.1990) (per curiam).

### B. *Abuse of Discretion*

 DGA asserts that the district court abused its discretion by awarding Champion the full cost of copying discovery documents under N.D. Cal. Civ. Loc. R. 54–3(d)(2).[7] That local rule is based on 28 U.S.C. § 1920(4), which permits a district court to tax as costs "[f]ees for exemplification and copies of papers necessarily obtained for use in the case." Under that statute, the copies need not actually have been used as evidence to justify an award of costs. *Haagen–Dazs*, 920 F.2d at 588. They need only have been "necessarily obtained" in the context of the litigation. *Id.*

DGA contends that the abuse of discretion lies in the fact that the approximately 14,000 documents at issue were copied *after* the district court already had granted summary judgment. DGA produced the documents on June 17, 1997, the day after the summary judgment hearing. The district court granted summary judgment to Champion on June 19, 1997. The copying invoice is not dated until July 8, 1997, almost three weeks later.

Champion responds that (1) if DGA had produced the documents sooner, it could have recovered its copying costs; and (2) if DGA were to succeed on appeal, Champion would need the documents later. The district court did not explain its rationale in awarding the copying costs.

In the circumstances, the district court abused its discretion in awarding Champion the $5,161.88 in copying costs. It may be that some or all of the documents could have met the "necessarily obtained" standard had Champion received them before the summary judgment proceeding concluded. But that is not what happened. After the district court granted summary judgment in Champion's favor, Champion had no reason pertaining to the proceedings in the district court for copying the documents. The possibility of reversal on appeal was not enough to justify the copying, either. The record discloses no reason why Champion could not have waited to copy the documents in the event that DGA were to prevail before this court.

The judgment in favor of Champion Discs, Inc., is AFFIRMED. The award of $5,161.88 in costs for copying discovery documents is VACATED. Costs on appeal are awarded to Champion Discs, Inc.

---

7. N.D. Cal. Civ. Loc. R. 54–3(d)(2) provides:

> The cost of reproducing disclosure or formal discovery documents when used for any purpose in the case is allowable.

ATTACHMENT

APPENDIX

POLE CAP PLUG

U.S. PATENT NO. 4039189

### DISC POLE HOLE® ASSEMBLY

CHAIN ASSEMBLY — welded and hot dipped galvanized.
 Hole Sign — 10 gauge steel, 8 in. diameter.
 Hole Sign Kit — vinyl numbers and identification cover.
 Collar (6 in.) — 2-1/4 in. O.D. tubing, .083 wall, drilled.
 Screws (3) — one-way screws #14 x 3/4 in.
 Rod Assembly — 3/8 in. steel rod.
 Chain — 500 lb. test.

BASKET ASSEMBLY — welded and hot dipped galvanized.
 Collar (5 in.) — 2-1/4 in. O.D. tubing, .083 wall, drilled.
 Screws (3) — one-way screws #14 x 3/4 in.
 Rod Assembly — 3/8 in. steel rod.

POLE (74 in.) — 2 in. O.D. tubing, .120 wall, hot dipped galvanized, drilled.

LOCKING COLLAR — welded and hot dipped galvanized.
 Collar (4 in.) — 2 in. O.D. tubing, .083 wall, drilled.
 Locking Tab — 3/16 in. steel, punched.
 Screws (3) — one-way screws #14 x 3/4 in.

LOCKING ANCHOR — welded and hot dipped galvanized
 Collar (24 in.) 2-1/4 in. O.D. tubing, .083 wall, drilled.
 Locking Tab — 3/16 in. steel, punched.

CONCRETE — approximately 1 cubic foot (concrete and lock not furnished).

POLE CAP PLUG

### SIGN POLE ASSEMBLY

OUT OF BOUNDS

SIGNS (12x18 in. and 18x24 in.) — 16 gauge steel, two coats baked enamel and silk screened.

BOLTS (4 per sign) — 5/16x3/4 in.

SIGN FRAMES — welded and hot dipped galvanized.
 Collar (12 in.) — 2-1/4 in. O.D. tubing, .083 wall, drilled.
 Frames (12x18 in. and 18x24 in.) — angle iron 1x1x1/8 in., hot rolled steel.
 Screws (3) — one-way screws #14 x 3/4 in.

POLE (74 in.) — 2 in. O.D tubing, .120 wall, hot dipped galvanized, drilled.

LOCKING COLLAR — welded and hot dipped galvanized
 Collar (4 in.) — 2 in. O.D. tubing, .083 wall, drilled.
 Locking Tab — 3/16 in. steel, punched.
 Screws (3) — one-way screws #14 x 3/4 in.

LOCKING ANCHOR — welded and hot dipped galvanized.
 Collar (24 in.) 2-1/4 in. O.D. tubing, .083 wall, drilled.
 Locking Tab — 3/16 in. steel, punched.

CONCRETE — approximately 1 cubic foot (concrete and lock not furnished)