**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

BLUMENTHAL DISTRIBUTING, INC.,
DBA Office Star,
 *Plaintiff-Counter-Defendant-*
  *Appellant/Cross-Appellee*,

   v.

HERMAN MILLER, INC.,
 *Defendant-Counter-Claimant-*
 *Appellee/Cross-Appellant.*

Nos. 18-56471
   18-56493

D.C. No.
5:14-cv-01926-
JAK-SP

OPINION

Appeal from the United States District Court
for the Central District of California
John A. Kronstadt, District Judge, Presiding

Argued and Submitted March 3, 2020
Pasadena, California

Filed June 25, 2020

Before: Andrew D. Hurwitz and Michelle T. Friedland,
Circuit Judges, and Edward R. Korman,[*] District Judge.

Opinion by Judge Korman;
Partial Concurrence and Partial Dissent by Judge Friedland

---

 [*] The Honorable Edward R. Korman, United States District Judge
for the Eastern District of New York, sitting by designation.

# SUMMARY**

## Lanham Act

The panel affirmed in part and reversed in part the district court's judgment after a jury trial on claims of infringement of trade dresses in Eames and Aeron chairs and remanded for a new trial.

The jury found that Henry Miller, Inc. ("HM")'s registered and unregistered Eames trade dresses were protectable, and that Blumenthal Distributing, Inc. ("OSP") willfully infringed and diluted them. HM was awarded infringement and dilution damages, and OSP was enjoined from continuing its unlawful activities. The jury found that HM's registered and unregistered claimed Aeron trade dresses were unprotectable because they were "functional," and the district court entered judgment holding invalid HM's trademark registration for the Aeron chair.

In its opinion and a concurrently-filed memorandum disposition, the panel affirmed the judgment in favor of HM on its causes of action or the infringement of its registered and unregistered Eames trade dresses; reversed the judgment in favor of HM on its cause of action for dilution; and reversed the judgment in favor of OSP regarding the Aeron chair and remanded for a new trial.

In Part II of its opinion, addressing functionality, the panel held that for a product's design to be protected under trademark law, the design must be nonfunctional. Utilitarian

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

functionality is based on how well the product works, and aesthetic functionality is based on how good the product looks. A claimed trade dress has utilitarian functionality if it is essential to the use or purpose of a product or affects its cost or quality. Under the *Disc Golf* test, the court considers: (1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. A claimed trade dress has aesthetic functionality if it serves an aesthetic purpose wholly independent of any source-identifying function, such that the trade dress's protection under trademark law would impose a significant non-reputation-related competitive disadvantage on its owner's competitors. When a claimed dress is defined as the "overall appearance" of a product, the tests for utilitarian and aesthetic functionality must be applied with extra care. A product's "overall appearance" is functional, and thus unprotectable, where the whole product is "nothing other than the assemblage of functional parts," and "even the arrangement and combination" of those parts is designed to make the product more functional. The standard for whether a claimed trade dress consisting of an "overall appearance" is functional is whether protecting the trade dress threatens to eliminate a substantial swath of competitive alternatives in the relevant market.

As to the Eames chairs, the panel held that the utilitarian functionality of their various features did not make their overall appearances functional as a matter of law.

As to the Aeron chairs, the panel held that the judge erred in instructing the jury on functionality because being part of the actual benefit that consumers wish to purchase when they

buy the product is not proof that a feature is functional. Further, the instruction did not capture the concepts that a feature that provides a utilitarian benefit is not functional unless the *Disc Golf* factors weigh in favor of finding it so; or that a feature that provides an aesthetic benefit is not functional unless that benefit is wholly independent of any source-identifying function and the feature's protection would put competitors at a significant non-reputation-related disadvantage. The panel reversed and remanded for a new trial on HM's Aeron-related claims.

In Part III, addressing fame, the panel held that to prevail on trade dress dilution, HM was required to prove that its claimed trade dresses were "famous" before OSP began selling its accused chairs. The panel held that the Trademark Dilution Revision Act of 2006 eliminated the concept of niche fame and defined fame as being "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894 (9th Cir. 2002), interpreting the Federal Trademark Dilution Act of 1995, which preceded the TDRA of 2006, held that fame among the general consuming public requires "a household name." Applying this standard, the panel held that HM fell short of its burden to supply legally sufficient evidence of the fame of its claimed Eames trade dresses. The panel therefore reversed the judgment against OSP for trade dress dilution.

Concurring in part and dissenting in part, Judge Friedland joined most of the majority's opinion but dissented as to Part III because she disagreed with the conclusion that there was insufficient evidence to sustain the jury's verdict in favor of HM on its claim for dilution of its Eames trade dresses.

## COUNSEL

David A. Dillard (argued), Sami I. Schilly, and Michael A. Koplow, Lewis Roca Rothgerber Christie LLP, Glendale, California, for Plaintiff-Counter-Defendant-Appellant/Cross-Appellee.

Jonathan E. Moskin (argued), Foley & Lardner LLP, New York, New York; Jean-Paul Ciardullo (argued) and Eva K. Freel, Foley & Lardner LLP, Los Angeles, California; for Defendant-Counter-Claimant-Appellee/Cross-Appellant.

## OPINION

KORMAN, District Judge:

Herman Miller, Inc. ("HM") sells Eames chairs and Aeron chairs. On December 13, 2013, HM sent a cease-and-desist letter to Blumenthal Distributing, Inc., d/b/a Office Star Products ("OSP"), accusing OSP of selling "knockoff" chairs that look like HM's Eames and Aeron chairs. The letter alleged infringement of HM's rights in the EAMES and AERON trade dresses under the Lanham Act. Litigation ensued, culminating in a jury trial on HM's claims for infringement of its registered claimed trade dresses under 15 U.S.C. § 1114, for infringement of its unregistered claimed trade dresses under 15 U.S.C. § 1125(a), and for dilution of all its claimed trade dresses under 15 U.S.C. § 1125(c).

As to the Eames chairs, HM won: The jury found that HM's registered and unregistered claimed EAMES trade dresses were protectable, and that OSP willfully infringed and diluted them. HM was eventually awarded $3,378,966

in infringement damages and $3,000,000 in dilution damages, and OSP was enjoined from continuing its unlawful activities. As to the Aeron chair, HM lost: The jury found that HM's registered and unregistered claimed AERON trade dresses were unprotectable because they were "functional." OSP was thus not found liable for infringing or diluting those claimed trade dresses, and judgment was entered holding them unprotectable and holding invalid HM's trademark registration for the Aeron chair, U.S. Trademark Registration No. 2,754,826. Both parties timely appealed.

For the reasons below and in the memorandum disposition concurrently filed today, we (1) affirm the judgment in favor of HM on its causes of action for the infringement of its registered and unregistered EAMES trade dresses; (2) reverse the judgment in favor of HM on its cause of action for dilution; and (3) reverse the judgment in favor of OSP regarding the Aeron chair and remand for a new trial.

## I. BACKGROUND

HM introduced the first Thin Pad Eames chair in 1958, and has sold hundreds of thousands of them in the United States, along with a related line of Soft Pad Eames chairs. The Aeron chairs were introduced in 1994 and were even more successful; by the time of trial, HM had sold 6.5 million of them in the United States. The Eames and Aeron chairs come in a range of models, and versions of each have been exhibited in American art museums and made repeated appearances in American pop culture.

HM's unregistered claimed EAMES trade dresses consist of the overall appearances of its Thin Pad and Soft Pad Eames chairs, excluding the chairs' colors and all components beneath the chairs' seats. HM's registered

claimed EAMES trade dress is the same, except that it excludes the chairs' upholstery. The nuances of the claimed trade dresses' scopes, and the difference between the registered and unregistered ones, are not material to the parties' dispute, and thus, consistent with the parties' briefs, we discuss all of the claimed EAMES trade dresses collectively as the Eames chairs' overall appearances. Examples of the Eames chairs appear below:



**Thin Pad**          **Soft Pad**

HM's unregistered claimed AERON trade dress was the overall appearance of the Aeron chair with an oval-shaped lumbar support, excluding the portion of the chair beneath the seat and the chair's color. HM's registered claimed AERON trade dress was the same, except that it also included the control box under the seat. As with the Eames chairs, the nuances of the claimed AERON trade dresses' scopes, and the difference between the registered and unregistered one, are not material to the parties' dispute, so we discuss all of the claimed AERON trade dresses

collectively as the Aeron chair's overall appearance. The
Aeron chair at issue appears below:



## II. FUNCTIONALITY

### A.  Summary of the Law on Functionality

In addition to using distinctive names, logos, packages,
or labels to identify its products, a seller can also design the
products themselves to have distinctive, source-identifying
appearances. Such appearances can receive protection under
trademark law against infringement and dilution. *See Wal-
Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209–
10 (2000) (holding that "trade dress constitutes a 'symbol'
or 'device' for purposes of the" Lanham Act's definition of
"trademark").

However, for a product's design to be protected under
trademark law, the design must be nonfunctional. *See Secalt
S.A. v. Wuxi Shenxi Constr. Mach. Co.*, 668 F.3d 677, 683
(9th Cir. 2012), *abrogated on other grounds by SunEarth,*

*Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016) (en banc). This requirement makes it very difficult for sellers to use trademark rights to monopolize designs of products. *See Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1012–13 & n.6 (9th Cir. 1999). "It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time . . . ." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995) (citing 35 U.S.C. §§ 154, 173); *see also* 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:5 (5th ed.) (hereinafter McCarthy).

The nonfunctionality requirement stops individual sellers from permanently monopolizing "functional" designs that they have not patented, or for which patents have expired. *See Qualitex*, 514 U.S. at 164–65. Allowing competitors to copy such designs has "salutary effects" for consumers. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001). A competitor who copies a product might manufacture and distribute it more efficiently, lower its price, and make it easier for consumers to buy. *See Millennium Labs, Inc. v. Ameritox, Ltd.*, 817 F.3d 1123, 1127 (9th Cir. 2016).

But what makes a claimed trade dress "functional"? In this context, "functionality" is a legal term of art, undefined by statute, around which a complicated legal doctrine has developed.

### 1.  *Utilitarian and Aesthetic Functionality*

In *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, the Supreme Court split functionality into two types, each with its own legal test. 532 U.S. 23, 32–33 (2001). The two types are "utilitarian functionality," which is based on how well

the product works, and "aesthetic functionality," which is based on how good the product looks. *See Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1067 (9th Cir. 2006) ("'utilitarian' functionality . . . relates to the performance of the product in its intended purpose); *see id.* at 1073–74 (aesthetic functionality is based on "'intrinsic' aesthetic appeal"). If the claimed trade dress has either type of functionality, it is unprotectable. *See id.* at 1072.

A claimed trade dress has utilitarian functionality if it is essential to the use or purpose of a product or affects its cost or quality. *See Millennium*, 817 F.3d at 1127–28 (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)). To determine whether this definition is satisfied, we use the four-factor test from *Disc Golf Association, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002 (9th Cir. 1998). *See Millennium*, 817 F.3d at 1129. The *Disc Golf* factors are: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Id.* at 1128 (quoting *Disc Golf*, 158 F.3d at 1006). "No one factor is dispositive; all should be weighed collectively." *Id.* at 1130 (quoting *Disc Golf*, 158 F.3d at 1006).

A claimed trade dress has aesthetic functionality if it serves "an aesthetic purpose wholly independent of any source identifying function," such that the trade dress's protection under trademark law "would impose a significant non-reputation-related competitive disadvantage" on its owner's competitors. *Id.* at 1129, 1131 (quoting *Au-Tomotive Gold*, 457 F.3d at 1072, 1073). This requirement aims to ensure that trademark law protects fair competition

between sellers, and does not sanction sellers' poaching their competitors' superior reputations. *See Au-Tomotive Gold*, 457 F.3d at 1073–74. Thus, the inquiry is whether, if one seller were given exclusive rights to use the claimed trade dress, other sellers would be forced to use alternative designs that make their products more costly to sell, or for which consumers' willingness to pay would be lower for reasons having nothing to do with the reputation of any source (e.g., the alternative designs would not have as much intrinsic aesthetic appeal). If such competitive disadvantages would be significant, then this second requirement for aesthetic functionality is satisfied.

## 2. *Functionality of Overall Appearances*

A plaintiff may define its claimed trade dress as the "overall appearance" of its product.[1] In principle, such claimed trade dresses are subject to the tests for utilitarian and aesthetic functionality, just like any other claimed trade dresses. However, when the claimed trade dress is an "overall appearance," these tests must be applied with extra care to prevent "semantic trickery" from obscuring the functionality of the design the plaintiff seeks to monopolize. *See Secalt*, 668 F.3d at 684 (quoting *Leatherman*, 199 F.3d at 1013). For example, if a particular combination of

---

[1] The scope of a "registered" claimed trade dress is defined by the seller in a registration filed with the United States Patent And Trademark Office, while the scope of an "unregistered" claimed trade dress, which does not depend on any registration, is typically defined through litigation. *Compare Talking Rain Beverage Co. v. S. Beach Beverage Co.*, 349 F.3d 601, 602–03 (9th Cir. 2003) (trademark plaintiff claiming registered trade dress in federally registered bottle design), *with Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1256–57 (9th Cir. 2001) (trademark plaintiff claiming unregistered trade dress in a series of individual features of its billiard halls).

functional features is itself functional, referring to that layout of features as the "overall appearance" of a product does not render it nonfunctional.

We have consistently held that, as a matter of law, a product's "overall appearance" is functional, and thus unprotectable, where the whole product is "nothing other than the assemblage of functional parts," and "even the arrangement and combination" of those parts is designed to make the product more functional. *Leatherman*, 199 F.3d at 1013 (9th Cir. 1999); *see also Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 786 (9th Cir. 2002); *Secalt*, 668 F.3d at 687. Thus, if everything that affects a product's appearance is functional, then its overall appearance is also functional. For example, in *Leatherman*, we held that the overall appearance of a multi-function pocket tool was not protectable as trade dress because there was no evidence that anything about its appearance—either its individual parts or their arrangement and combination—existed for any nonfunctional purpose. 199 F.3d at 1013.

Consistent with that rule, we have also held that the proper standard for whether a claimed trade dress consisting of an "overall appearance" is functional is whether "protecting the trade dress threatens to eliminate a substantial swath of competitive alternatives in the relevant market." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1261 n.5 (9th Cir. 2001) (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 n.6 (5th Cir. 1991)). For example, in *Clicks Billiards*, we held that the plaintiff pool hall restaurant's asserted trade dress in its total visual appearance, "examined as a whole," was nonfunctional, noting that protecting that trade dress would leave a multitude of alternatives to the pool hall industry. *Id.* at 1258–62; *see also, e.g.*, *Millennium*, 817 F.3d at 1130–31

(evaluating the functionality of a graphical format of presenting data by looking to the "overall visual impression that the combination and arrangement" of its elements creates (quoting *Clicks Billiards*, 251 F.3d at 1259)).

HM argues that, because the examination must be holistic, the functionality of individual features is irrelevant. But that "cannot be the case." *Tie Tech*, 296 F.3d at 785–86. Examining a product "as a whole" does not require any strained effort to look at its gestalt without seeing its individual features. Rather, to examine a product "as a whole" is to examine all of its features, including the ways in which its various parts are combined or arranged, and to recognize that nonfunctional combinations or arrangements of functional parts can create an overall appearance that should be deemed nonfunctional. *See Leatherman*, 199 F.3d at 1011 n.3, 1013.

## B.  The Eames Chairs

Against this legal backdrop, we now address the specific functionality-related issues on appeal, beginning with the Eames chairs. OSP argues that HM's claimed EAMES trade dresses are functional (and thus unprotectable) as a matter of law. We review the issue de novo, determining "whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 604 (9th Cir. 2016) (citation and internal quotation marks omitted).

OSP argues that the Eames chairs' overall appearances should be found functional as a matter of law because: (i) the undisputed fact that the chairs have *some* utilitarian functionality proves their overall appearances functional; and (ii) the utilitarian functionality of the chairs' various

features proves their overall appearances functional under the *Disc Golf* factors. Both arguments fail.

OSP's first argument—that the chairs' overall appearances are functional "because they *include*, in whole or *in part*, elements that are functional" (emphasis added)—is a nonstarter. As we have long held, a product's overall appearance is necessarily functional if *everything* about it is functional, not merely if *anything* about it is functional. *See Clicks Billiards*, 251 F.3d at 1259; *Leatherman*, 199 F.3d at 1011 n.3, 1013. OSP's proposed rule would wipe out trademark protection for all, or at least virtually all, consumer products' overall appearances. For instance, every chair's appearance is affected by having a backrest, as opposed to having no backrest, which serves the utilitarian function of providing back support. But that does not mean that every chair's overall appearance is functional as a matter of law.

OSP's second argument is that the Eames chairs' overall appearances are functional as a matter of law because they have utilitarian functionality under the *Disc Golf* factors. Significantly, OSP argued in its opening brief that "aesthetic functionality . . . is not an issue in this case," and "only" the test for utilitarian functionality "is relevant." Thus, we limit our analysis to the consideration of utilitarian functionality and hold that the utilitarian functionality of the Eames chairs' various features does not make the chairs' overall appearances functional as a matter of law.

The Eames chairs are nothing like the thoroughly utilitarian products whose overall appearances were held functional as a matter of law in *Leatherman* (a pocket-knife-like tool), *Tie Tech* (a tool used in emergencies to quickly cut people out of wheelchairs), and *Secalt* (a piece of industrial machinery called a "traction hoist"). In each of

those cases, the product's "form ... follow[ed] its [utilitarian] function[s]," *Secalt*, 668 F.3d at 687, and there was no evidence of any non-utilitarian design choices. *See Leatherman*, 199 F.3d at 1013; *Secalt*, 668 F.3d at 686; *Tie Tech*, 296 F.3d at 786. In the present case, however, HM introduced abundant evidence that the Eames chairs' overall appearances derive from non-utilitarian design choices.

The jury was shown images of the Eames chairs, from which it could have reasonably inferred that the chairs were designed largely to be distinctive and/or beautiful, even at some expense to their "utilitarian advantage," *Disc Golf*, 158 F.3d at 1006. For example, the jury could have reasonably concluded that the metal trapezoidal design of the Eames chairs' armrests was motivated by design considerations, at the expense of the comfort that a softer surface could have provided.

HM's expert furniture historian testified that the Eames chairs' designers, Charles and Ray Eames, were "always working to find the exact right look of something" and "were as much sculptors as they were designers." He also testified that the "aesthetics were one of the most important considerations" in the Thin Pad Eames chairs' design and that the Soft Pad Eames chairs were "iconic pieces" whose "visual or aesthetic impact" was "significant." A program manager for HM testified that he was not aware of any utilitarian purpose for several features of the Eames chairs, including the specific trapezoidal shape of the armrests, the one-piece construction of the seat and the back, and the specific horizontal stitching of the Thin Pad upholstery. HM's industrial design expert also testified that those three features (among others) lacked utilitarian function and that their purposes were aesthetic. He also testified that the

"overall design" of the Eames chairs is "distinctive and is not functional."

A reasonable jury could have concluded that the remaining *Disc Golf* factors also showed utilitarian functionality. HM introduced testimony suggesting that a variety of alternative designs could have achieved the Eames design's functional advantages, so competitors would not be unreasonably limited in their chair design options if the Eames trade dress were protected. HM also introduced advertising materials that emphasized the Eames chairs' distinctive appearances through large, artistic photographs and statements touting their appearances as "unmistakable," "bear[ing] the distinctive stamp of Charles and Ray Eames," and being "totally different" from other chairs. And HM introduced some testimony suggesting that at least some of the manufacturing techniques it employed required specialized technical equipment.

OSP's rebuttal to all of this evidence did not compel a different conclusion. For example, OSP attempts to show that the armrests' trapezoidal shape has utilitarian functionality because it enables the "armrests to be attached to the [rest of the chair] at three points" rather than two points, but cites no evidence that the extra point of attachment has any utilitarian benefit. Similarly, OSP argues that the armrests' rounded corners have utilitarian functionality because they "provide greater safety as compared to sharp corners," but cites no evidence that the roundness of the corners was ever intended, advertised, or perceived as a safety feature. Thus, we reject OSP's argument that the utilitarian functionality of the Eames chairs' component parts renders their overall appearances functional as a matter of law.

### C.  The Aeron Chair

In a cross-appeal, HM challenges the judgment that its claimed AERON trade dresses were functional and thus unprotectable. HM argues that there must be a new trial because Jury Instruction 25 (the "Functionality Instruction") used an erroneously broad definition of functionality. "We review a district court's formulation of civil jury instructions for abuse of discretion, but we review de novo whether an instruction states the law correctly." *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc) (citations omitted).

HM's challenge focuses on the following excerpt from the Functionality Instruction:

> A product feature . . . is non-functional if its shape or form makes no contribution to the product's function or operation. If the feature is part of the actual benefit that consumers wish to purchase when they buy the product, the feature is functional. However, if the feature serves no purpose other than as an assurance that a particular entity made, sponsored or endorsed the product, it is non-functional.

We agree with HM that this excerpt misstates the law. It is not true that being "part of the actual benefit that consumers wish to purchase when they buy the product" is proof that a feature is functional. Indeed, we have stated that "the mere fact that [a] mark is the 'benefit that the consumer wishes to purchase' will *not*" suffice to establish its functionality. *Au-Tomotive Gold*, 457 F.3d at 1069 (emphasis added) (citation omitted); *see also id.* at 1073 ((rejecting suggestion that trademarks are functional when "the trademarks

'constitute[ ] the actual benefit the consumer wishes to purchase'" because it "flies in the face of existing caselaw" (alteration in original)). And the instruction does not capture the concepts, explained above, that a feature that provides a utilitarian benefit is not functional unless the *Disc Golf* factors weigh in favor of finding it so; or that a feature that provides an aesthetic benefit is not functional unless that benefit is wholly independent of any source-identifying function and the feature's protection would put competitors at a significant non-reputation-related disadvantage. *See Millennium*, 817 F.3d at 1128–29. Due to this inaccuracy, the instructions, viewed as a whole, do not "fairly and correctly cover[]" the law of functionality. *See Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1194 (9th Cir. 2019) (quoting *Miller v. Republic Nat'l Life Ins. Co.*, 789 F.2d 1336, 1339 (9th Cir. 1986)).

"An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless." *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (citation omitted). Because such errors are presumed harmful, the "burden shifts to the [prevailing party] to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Id.* (citation omitted). OSP did not address the issue of harmfulness in its answering brief, and thus did not overcome the presumption of harmfulness. *See id.* Consequently, the error in the Functionality Instruction requires reversal and remand for a new trial on HM's Aeron-related claims.[2]

---

[2] Without commenting on the merits of the issue, we vacate the district court's ruling that the unregistered claimed AERON trade dress possesses secondary meaning as a matter of law, so that all of the issues

We recognize that the district court appears to have derived the Functionality Instruction from Ninth Circuit Model Civil Jury Instruction 15.12. But because that instruction does not accurately track our functionality caselaw, *see Millennium*, 817 F.3d at 1128–29; *Au-Tomotive Gold*, 457 F.3d at 1072 & n.8, its use was error and we must reverse. *See United States v. Warren*, 984 F.2d 325, 327 n.3 (9th Cir. 1993) ("Use of a model jury instruction does not preclude a finding of error.").

## III.    Fame

We now turn our focus to HM's cause of action for dilution of its claimed EAMES trade dresses. To prevail on dilution, HM was required to prove that those claimed trade dresses were "famous" before OSP began selling its accused chairs. *See* 15 U.S.C. § 1125(c)(1). OSP challenges the district court's denial of its Rule 50(b) motion, in which OSP argued that the evidence of the claimed EAMES trade dresses' fame was legally insufficient.

From 1996 to 2006, the standard for determining fame was based on the Federal Trademark Dilution Act of 1995 ("FTDA of 1995"), an amendment to the Lanham Act that set out a non-exhaustive list of eight factors that courts "may consider." *See* Pub. L. No. 104-98, § 3(a), 109 Stat. 985 (1996). We interpreted that statute to recognize two kinds of fame: fame within "only a limited geographic area or a specialized market segment" (or "niche fame") and "fame among the general consuming public." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 908, 911 (9th Cir. 2002).

---

related to HM's Aeron-related claims can be decided in the new trial. *See Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1133–34 (9th Cir. 1995).

The FTDA of 1995 was replaced by the Trademark Dilution Revision Act of 2006 ("TDRA of 2006"), which eliminated the concept of niche fame, defining fame as being "widely recognized by the *general consuming public* of the United States as a designation of source of the goods or services of the mark's owner," 15 U.S.C. § 1125(c)(2)(A) (emphasis added), and omitting from its list of suggested factors the two from the FTDA of 1995 that related to niche markets.[3] Thus, niche fame can no longer make a trademark eligible for protection against dilution; instead, the trademark must be "widely recognized by the general consuming public of the United States." *Id.*

While the FTDA of 1995 was still in effect, we decided *Thane*, in which we applied a very high standard for establishing fame among the general consuming public. The issue in that case was whether a stationary exercise machine producer's "OrbiTrek" mark infringed the Trek Bicycle Corporation's "TREK" mark. We held that the requisite level of fame was that of "a household name." *Thane*, 305 F.3d at 911. The mark must be in a "select class" of those that are "truly prominent and renowned" and "part of the collective national consciousness." *Id.* at 911–12 (first and second quoting *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999)). We held that Trek had failed as a matter of law to establish "household name" fame of its TREK mark, even though the mark was registered; the company spent "between $3 million and $5 million per year"

---

[3] The two omitted niche-related factors were "the channels of trade for the goods or services with which the mark is used" and "the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought." *See Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875–78 (9th Cir. 1999).

on advertising, including in mainstream publications such as *Rolling Stone Magazine*, *Playboy*, and *Men's Journal*; had around 4.5 million visitors to its website per year; made over 1,000 different products with the TREK mark that were sold by over 1,600 independent dealers in 2,000 locations across the nation; and sponsored superstar Lance Armstrong, who used TREK bicycles to win multiple Tour de France races, and appeared with a TREK bicycle on the front page of large circulation newspapers, at a press event with a sitting President, and even on a Wheaties box. *Id.* at 899, 912.

In holding that Trek Bicycle Corporation failed to make the necessary "showing of the requisite *level* of fame" for its mark, *id.* at 911, we reasoned that "incidental media coverage," such as that connected to Lance Armstrong, did not "by itself constitute evidence" that the mark was famous, because "[m]any products receive broad incidental media coverage." *Id.* at 912. We also reasoned that "[a]dvertising to a mass audience is not the same as achieving fame with a mass audience and, by themselves, such advertisements prove only that Trek desires widespread fame, not that it has achieved it." *Id.* at 912 n.13. "On the other hand," we explained, "surveys showing that a large percentage of the general public recognizes the brand, press accounts about the popularity of the brand, or pop-culture references involving the brand would provide evidence of fame." *Id.* at 912.

Although *Thane* interpreted the FTDA of 1995, we do not interpret the TDRA of 2006 to have lowered the standard for whether a mark "has achieved fame among the general consuming public." *Id.* at 911; *see Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1372–73 (Fed. Cir. 2012) ("By using the 'general consuming public' as the benchmark, the [TDRA of 2006] eliminated the possibility of 'niche fame' . . . . In other words, a famous mark is one

that has become a 'household name.'"); *see also* McCarthy § 24:104. Applying *Thane*'s standard, we conclude that HM fell short of its burden to supply legally sufficient evidence of the fame of the claimed EAMES trade dresses.

Taken in the light most favorable to HM, the evidence establishes only that: HM spent, on average, $550,000 per year on advertising the Eames chairs from 2004 through 2015 (and under $400,000 per year from 2004 through 2009); the Eames chairs appeared in obscure publications such as *Contract*, *Metropolis*, and an "industry publication" called *Monday Morning Quarterback*; at the time of trial in 2016, HM had, at the very most, around 875,000 unique followers on Facebook, Twitter, and Instagram combined; most of the Eames chairs are sold through a distribution channel consisting of only around 45 independently owned dealers with 130 locations across the country; and the Eames chairs were "very heavily" featured in the TV show *Mad Men*, have appeared in other TV shows and movies, and have been exhibited at several American museums, including the Museum of Modern Art and the Henry Ford Museum. Because the evidence of the claimed EAMES trade dresses' fame is plainly weaker than the evidence that *Thane* held legally insufficient, we must hold that, as a matter of law, those trade dresses were not famous.

HM's efforts to avoid *Thane*'s demanding standard fail. In *Horphag Research Ltd. v. Garcia*, a case on which HM relies to suggest a more modest standard, the appellant did not raise the issue of whether any mark was sufficiently famous, so we neither considered nor decided that issue. *See* 475 F.3d 1029, 1036, 1038 (9th Cir. 2007). HM also argues that we should not disturb the jury's finding that the claimed EAMES trade dresses were famous because OSP did not object to the relevant jury instruction. But, even if the

instructions accurately stated the law, the legal question before us is whether HM offered evidence sufficient to allow a reasonable jury to conclude that the EAMES trade dress met the definition of fame. That legal definition, which we explicated in *Thane*, is fatal to HM's dilution claims.[4]

Because there was legally insufficient evidence to find that the claimed EAMES trade dresses were famous under 15 U.S.C. § 1125(c)(2)(A), the judgment against OSP for their dilution must be reversed.

## IV.   CONCLUSION

Based on this opinion and the simultaneously filed memorandum disposition, we affirm the judgment in favor of HM on its causes of action for the infringement of its registered and unregistered claimed EAMES trade dresses. We reverse the judgment in favor of HM on its cause of action for dilution.

We reverse the portion of the judgment regarding the Aeron chair in its entirety, and remand for a new trial.

**AFFIRMED in part, REVERSED in part and REMANDED.**

---

[4] Although focusing on some practical differences between trade names and trade dresses, the dissent correctly recognizes that a dilution claim requires that the general consuming public recognize either type of mark "as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). Even assuming that the shape of the Eames chair is more recognizable than the name "Trek," there nonetheless was no basis from which the jury could reasonably infer that the general consuming public would link all Eames-shaped chairs to a single source of goods.

FRIEDLAND, Circuit Judge, concurring in part and dissenting in part:

Although I join most of the majority's opinion, I disagree with the conclusion that there was insufficient evidence to sustain the jury's verdict in favor of Herman Miller ("HM") on its claim for dilution of its EAMES trade dresses. I therefore dissent as to Part III.

A jury's verdict must be sustained on a renewed motion for judgment as a matter of law unless "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)). Only in "rare cases" should we overturn a jury's verdict under this deferential standard. *Barnard v. Theobald*, 721 F.3d 1069, 1076 (9th Cir. 2013). This is not such a case.

For HM to prevail on its dilution claim, the jury was required to find that the EAMES trade dresses were sufficiently "famous"—that is, that they were "widely recognized by the general consuming public of the United States as a designation of source of the goods or services" of the trade dress owner. 15 U.S.C. § 1125(c)(2)(A). A trade dress is famous when the general consuming public recognizes the trade dress as associated with a singular owner; as is true throughout trademark law, whether the general consuming public could *name* that owner is irrelevant. *See Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 887 (9th Cir. 1996) (explaining that the secondary meaning of a mark is established through proof that the public associates the mark "with a single source, even if that source is anonymous"); 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair*

*Competition* § 3:12 (5th ed.) (explaining that "[a] trademark can identify a single, albeit *anonymous* source," such that a buyer need not know "the corporate name of the producer or seller" (emphasis added)).

At trial, the jury heard expert testimony that Eames Thin Pad and Soft Pad chairs were "iconic" pieces that "had significant impact on the design world." HM experts opined that the Eames chairs were "ubiquitous" in conference rooms and were often used as seating in lobbies or in other public spaces within office environments. Expert testimony further established that Eames chairs were depicted in "countless TV shows," including the long-running series "Mad Men," and in blockbuster movies. And the chairs were featured in "any museum in the United States" with "a collection of design."

Construed in the light most favorable to HM, this evidence was sufficient to support the jury's verdict. The jury was entitled to deem HM's experts credible and to infer from their testimony that the general consuming public had become familiar with the Eames chairs through encounters in business environments, pop culture, and museums. And because HM presented evidence that the Eames chairs had a distinctive design, the jury was entitled to find that the consuming public recognized trade dresses central to that design as a signature of chairs made by a leading furniture manufacturer, even if they could not specifically name HM as that manufacturer. Although this was not the only finding the jury could have made based on the evidence, it was a reasonable one.

The majority's contrary conclusion stems largely from a side-by-side comparison with the facts of *Thane International, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894 (9th Cir. 2002), in which we held that the evidence at

summary judgment was insufficient to establish that the Trek Bicycle Corporation's "TREK" mark was famous enough to support a claim for dilution. *Id.* at 910–12. We noted that the "closest" Trek came to demonstrating recognition by "a large portion of the general consuming public" was to produce evidence depicting Lance Armstrong with a Trek bicycle on newspaper front pages and Wheaties boxes. *Id.* at 912. In so observing, we relatedly indicated that the other evidence in the record—such as the company's $3 to $5 million in advertising expenditures, 4.5 million website visitors, and robust commercial sales—was insufficient to support a finding of fame. *See id.* at 899, 912.

There is stronger evidence here than there was in *Thane* of actual consumer recognition: the Eames chairs were "ubiquitous" in office environments and depicted in "countless" TV shows and movies. And the Eames chairs had an "iconic," visually striking design deemed worthy of museum displays, whereas in *Thane* "TREK" was a non-distinctive four-letter term with multiple meanings. *See id.* at 912 n.14 (explaining that "trek" is a "common English language word" used to refer to concepts and products other than Trek bicycles). Yet the majority nonetheless seems to require HM and its Eames chairs to have greater advertising expenditures, a more significant web presence, or a higher volume of commercial sales than Trek bicycles for there to be sufficient evidence supporting the EAMES trade dresses' fame. *See* Maj. Op. at 22.

In my view, the majority's analysis is misguided. It is not surprising that we concluded in *Thane* that Trek's evidence was insufficient to prove the fame of the "TREK" mark. Given that the "TREK" mark was a non-distinctive word that received only some "incidental media coverage," *Thane* reasonably suggested that consumers would not have

recognized the mark absent more sales, more advertising, or more Internet engagement that familiarized the general public with the mark. *See Thane*, 305 F.3d at 912. But that conclusion has little bearing on what was required to cause the general public to recognize the trade dresses at issue here. Unlike the nondescript word "TREK," the EAMES trade dresses consisted of a distinctive product design that the jury could have inferred was memorable to many consumers who saw the chairs. While members of the public can consume products or encounter advertisements for products without focusing on the marks they feature, it would be difficult for consumers to interact with a product without forming an impression of its overall appearance (its dress)—particularly when that appearance is distinctive.

Moreover, while the media portrayals of "TREK" did little to raise the mark's profile, HM presented evidence that the general consuming public became familiar with the EAMES trade dresses through the chairs' being widely depicted in pop culture, displayed in museums, and featured in business environments. And HM's evidence suggested that, far from being "incidental," *see id.*, the design aspects of the Eames chairs—including their trade dresses—were the very reason the chairs were popular in business environments and displayed in museums. From this evidence, the jury could have concluded that many consumers who saw the chairs featured in such settings took note of them and their distinctive designs. By contrast, in *Thane*, the central focus of the Wheaties boxes and the newspaper stories was Lance Armstrong—not the mark on his bike, which consumers could easily have overlooked.

Accordingly, the jury could have inferred that a higher level of advertising or sales exposure was not required to render the Eames chairs' design widely recognizable. Even

if too few Eames chairs were sold for them to be present in most households or offices, and even if there was too little advertising for it to reach the average consumer, HM's evidence nevertheless allowed the jury to conclude that many individual chairs reached a wide audience and were recognized on account of their distinctive design.[1]

In sum, HM's failure to satisfy the metrics the majority identifies did not preclude the jury from finding that its trade dresses were famous. To the contrary, as *Thane* itself recognized, evidence of a trade dress's cultural significance may provide evidence of fame. *Id.* at 912. In my view, HM introduced sufficient evidence of such significance to render the question of fame one for the jury. This is not one of the "rare cases" in which we should disturb the jury's conclusion. *See Barnard*, 721 F.3d at 1076.

---

[1] In overturning the jury's fame finding, the majority also appears to rely on the fact that the number of people who follow HM on social media is lower than the number of people who visited Trek Bicycle's website. *See* Maj. Op. at 21, 22–23. But there was no need for HM to present evidence of a high level of social media engagement with HM itself, given that the question whether the EAMES trade dresses were widely recognized as a "designation of source," *see* 15 U.S.C. § 1125(c)(2)(A), does not depend on consumers' actually being able to name HM as the source of those trade dresses, *see Maljack Prods.*, 81 F.3d at 887.